UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYIERRE C. PERRY,<br><br>          Petitioner,<br><br>v.<br><br>G.J. JANDA, et al.<br><br>          Respondents. | Case No. 12-CV-2512-LAB (JMA)<br><br>**REPORT AND RECOMMENDATION RE DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

### I.     Introduction

Petitioner Tyierre C. Perry ("Petitioner" or "Perry"), a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. On February 4, 2010, Petitioner was convicted by jury in San Diego Superior Court case number SCD202276 of first degree felony murder of Spencer Watts (Cal. Penal Code § 187(a)) with use of a firearm (count 1); attempted robbery of Spencer Watts (id. §§ 664 & 211) with use of a firearm (count 2); and robbery of Keenan Wheeler (id. § 211) with use of a firearm (count 3). (Lodgment No. 1, Clerk's Transcript ("CT") at 103-06.)  Petitioner contends the trial court committed prejudicial Doyle[1]

---

[1] Doyle v. Ohio, 426 U.S. 610 (1976).

error by admitting two statements he made after he was read his Miranda[2] rights following his arrest.  (See Pet. at 6-6(a).)

The Court has considered the Petition, Respondent's Answer and Memorandum of Points and Authorities in support thereof, and all the supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court recommends that the Petition be **DENIED**.

## II. Factual Background

The following statement of facts is taken from the California Court of Appeal opinion, People v. Tyierre Christian Perry, No. D057006, slip op. (Cal. Ct. App. Jan. 31, 2012).  (Lodgment No. 5.)  This Court gives deference to state court findings of fact and presumes them to be correct. Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008).  Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  Id.; see also 28 U.S.C. § 2254(e)(1).  The facts as found by the state appellate court are as follows:

*1.  The homicide*

On April 22, 2006, Keenan Wheeler and his friend Spencer Watts picked up Ecstasy pills they planned to sell that night. That evening, when Watts and Wheeler were at Duana Lewis's home, Watts received a telephone call and told the caller to "have Homey call me."  Watts then received a direct-connect or walkie-talkie type call on his cell phone, and Lewis heard a male on the other end say, "you go meet me, cuz."  Watts and Wheeler left Lewis's home at around 8:30 p.m. that evening.

Watts, who went by the nickname "Black," had received a direct-connect call on his cell phone to meet the person who wanted to buy the Ecstasy pills at the Walmart in the College Grove Shopping Center.  Watts drove his car into the Walmart parking lot with Wheeler sitting in the front passenger seat. Each had a bag of Ecstasy pills.

According to Wheeler, two males got into the back seat of

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

Watts's car. One—who the prosecutor argued in his closing was Perry—was the darker-skinned shooter who sat behind Watts. Wheeler testified the shooter was "probably" 5 feet 10 inches tall, was in his early- or mid-20's, "maybe" had a faint moustache, wore on his head a doo-rag and a baseball cap turned to the side, had a "thin" but muscular build, and weighed "maybe" 150 pounds. The second male, who had a lighter complexion and sat behind Wheeler, was not wearing a doo-rag or hat.

Watts asked the two males where they were from, and they both said, "Oceanside." According to Wheeler, the four men shook hands and the darker male sitting behind Watts (Perry) said, "Oceanside Crip" or "West Coast Crip." Robert Minton, a San Diego police officer who interviewed Wheeler at the scene after the shooting, testified that Wheeler told him the person who sat behind the driver's seat said they were Oceanside Crips.

According to Wheeler, Perry said he wanted to see the product and Watts handed him one of the bags of Ecstasy pills. Watts told him how much the bag cost and asked him for the money. Perry pulled out a gun and told the other male, "Go through his pockets." Perry also told Watts and Wheeler to give him everything in their pockets. Perry's companion took $20 from Wheeler's left pocket.

Perry tried to go through Watts's pockets, but Watts resisted and struggled with him. Perry said something like, "You think this is a game? You think I'm playing around?" Watts told Perry, "You are not going through my fucking pockets," and, "Fuck that. If you are going to shoot, shoot me. You might as well shoot me now." Watts then put the car in reverse.

Perry reached forward, tried to put the gearshift back in park, but put it in neutral, and the car started to roll backward. The male sitting behind Wheeler hopped out of the car and told Perry, "Shoot him." Perry immediately fired one shot and got out of the car. He and his companion ran away, taking one of Watts's three phones that had been by the gearshift.

Watts grabbed at his chest and started to tense up. Wheeler saw blood rush from Watts's nose and mouth, and then Watts became unresponsive. Wheeler grabbed one of Watts's cell phones, called 911 at about 8:55 p.m., and told the police dispatcher that a Black male tried to rob them and shot his friend. Watts died from the gunshot wound. The autopsy showed the bullet entered Watts's back and traveled through his right lung and heart.

2.   *The investigation*

The police found two plastic baggies containing Ecstasy pills and a pair of rubber latex gloves near Watts's car.

Perry's fingerprints were found on the driver's side rear

passenger door in two places. Both prints, which were from Perry's left middle finger, were pointed downward toward the back of the car.

A Motorola Boost push-to-talk cell phone (also known as a "Lady Thug" Motorola phone), which belonged to Latishia Rivera, was found on the ground about 10 feet from the car. Rivera's phone had been used for several communications with a cell phone found in the driver-side door of Watts's car. On April 20, 2006, there were 19 calls between these two phones; on April 22 (the day Watts was killed), there were 12 such calls; and the first communication on April 20 took place at 1:08 p.m. The last push-to-talk or direct-connect call between these two phones was made at 8:50 p.m. on April 22.

Rivera's cell phone had two contact entries under the name "Bklacc," and the speed dial numbers for these address book contact entries were 56 and 58 out of 60 entries, indicating the numbers were recently stored.

Rivera was Perry's girlfriend in April 2006, and the two were staying together in a house in El Cajon at that time. Rivera acknowledged that her push-to-talk phone was found at the scene of the crime. Perry did not have his phone during the weekend of April 22, 2006, either because he ran out of minutes or lost it. Rivera did not use her phone or lend it to anyone that weekend, and she did not know whether Perry took it. When the police interviewed her in 2006, she initially lied and said she lost her phone.

Rivera stated she did not recognize the phonebook entries for "Bklacc"–which is slang that she pronounced as "black"–in her phone. She had seen Perry use "CC" instead of "CK," but she did not think Perry would write "black" as "Bklacc." She acknowledged there were a lot of direct-connect calls between her phone and "Bklacc," but she did not make any of them, and, although it was possible Perry made those calls, she did not know whether he did.

Rivera said that on the night of April 22 she and Perry watched television together. She went to bed alone early that night, and Perry remained on the couch. Rivera did not know when she went to bed, but stated it was dark outside. Perry was in bed with her when she woke up the next morning.

. . . .

San Diego Police Detective Bruce Pendleton testified about his interview with Rosalyn Stanley regarding the Watts homicide and whether she had information about who may have been involved in the killing. Detective Pendleton asked her about a conversation she had with Antonio "Tony" (or "Shorty-Six") Winfield. Stanley indicated she was at a party when Winfield told her he knew who killed Watts. (. . . . Stanley claimed at trial she had been in a "drug blur" at the party and did not remember talking to Winfield there and also did not remember

what she said to Detective Pendleton during the interview.) Winfield said Perry told him that he only intended to rob Watts, not kill him.

San Diego County District Attorney Investigator Matthew O'Deane testified about his interview with Winfield. Winfield told him he was a close friend of both Watts and Perry. In August 2006, when Winfield saw Perry at a party and asked him about the shooting of Watts, Perry told Winfield that he met with Watts to buy Ecstasy pills, but he did not shoot Watts, and he dropped his phone when he was buying the drugs. (At trial, Winfield denied saying this, and claimed Perry told him he had nothing to do with the shooting. Winfield also denied telling Stanley that Perry told him it was his (Perry's) intention to rob Watts but not to shoot him.)

San Diego Police Detective Johnny Keene retrieved security videotapes from the Walmart at the shopping center on College Grove Avenue. One of the videos appeared to show Watts's BMW. It showed a car driving down one of the aisles in the parking lot, parking in a stall for two or three minutes, and then rolling backward.

. . . .

### 3.   Gang evidence

The parties stipulated that Perry was a member of South Oceanside Gangster Crips on April 22, 2006 (the date Watts was killed). South Oceanside Gangster Crips is one of five documented Crips criminal street gang sets in Oceanside.

Oceanside Police Detective Gordon Govier testified about certain ways that Crip members speak and write. Crips will not use a "C" and "K" together because to do so is a sign of disrespect towards Crips gang members. Instead, a Crip member will use "CC" or "KK." The telephone contact "Bklacc" (in Rivera's cell phone) was consistent with how a Crips gang member would write. Detective Govier found writings on Perry's MySpace page that were consistent with how a Crips gang member would write.

Detective Govier testified that Crips gang members will use the term "cuz" as a greeting when communicating with each other or to let others know who they are. This term is a sign of disrespect when used towards a rival gang member or someone who is not part of the gang culture. He opined that if someone called Watts "cuz" while talking to him, it would have been a sign of disrespect, and it also could have been used to let Watts know with whom he was dealing and to instill fear in him.

### 4.   Perry's arrest and incriminating statements; other evidence

On December 17, 2007, after searching for more than a year

and a half, Perry was located and arrested in Escondido. Escondido police officers transported Perry to the San Diego Police Department. Detective Pendleton testified that while Perry was waiting to be transported to the county jail, Perry said he did not want to "screw himself." Perry's statement was not a response to any question or statement made by Detective Pendleton. Perry also stated, "This was accidental."

At trial, Wheeler stated he and Watts had gone to the mall in Oceanside about three weeks before Watts was killed. They talked to an African-American male with a doo-rag. Wheeler testified it was the same male he saw in a lineup about a month before trial, and he did not tell the police that it looked like the same person because it just came to him as he was testifying. Wheeler also testified he picked Perry out of a live lineup, but that he could not tell the jury Perry was the shooter because he was not "110 percent sure" it was him; he picked out Perry in the lineup because he recognized Perry from seeing him in court. Wheeler also stated that when he was at a mall in Oceanside, he saw a person who looked like Perry talking to Watts.

. . . .

(Lodgment No. 5 at 3-10.)

The California Court of Appeal provided the following background regarding Petitioner's *Doyle* error claim:

1. *Defense exclusion motion and related Evidence Code section 402 hearing*

Before trial, Petitioner moved for exclusion of evidence of the statements he made after he invoked his Fifth Amendment right to remain silent. The court conducted a pretrial hearing under [California] Evidence Code section 402 to determine whether Perry's post-invocation statements were admissible.

The sole witness, Detective Pendleton, testified that Escondido Police Department officers arrested Perry and transported him to the San Diego Police Department headquarters. Detective Pendleton and his partner, Detective Beard, attempted to interview Perry there. He first read to Perry his *Miranda* rights. Detective Pendleton stated that when he asked Perry whether he was willing to talk to him, Perry asked for an attorney; and, after discussing Perry's request, Detective Pendleton stopped the interview.

Detective Pendleton stated that after Perry went through the booking process, which lasted about 15 to 20 minutes, he was placed in a holding cell for another 15 to 20 minutes while Detective Pendleton completed the booking paperwork. While Perry was in the holding cell, he asked Detective Pendleton how he could give the detective information about what

happened. Detective Pendleton gave Perry his business card and told him he could have his attorney call him (Detective Pendleton). Detective Pendleton stated that, during this time, he did not ask Perry any questions about the shooting.

After the booking process and paperwork were complete, Detective Pendleton walked with Perry to the sally port–a secure garage-like area where police cars drive through to drop off and pick up prisoners–and put him in a patrol car to be transported to the county jail. However, Perry had left with his personal property a phone number he wanted, so he asked Detective Pendleton to find it for him. Detective Pendleton took Perry out of the patrol car and had him sit at a table so they could look through his personal property for the phone number.

After Perry sat down at the table, he said he did not want to screw himself. Perry's statement was not prompted by any questions from Detective Pendleton.

Detective Pendleton then asked Perry whether he now wanted to talk to him, and told Perry that if he did want to talk, he (Detective Pendleton) would have to take Perry upstairs again to re-admonish him. Perry said, "No, this was an accident."

Detective Pendleton testified he replied that he did not "see it as accidental," and the word "it" referred to the shooting. Perry responded, "There was a witness," and Detective Pendleton replied, "We [have] spoke[n] to a lot of witnesses." In turn, Perry said, "You guys are trying to put me [in] jail."

After Detective Pendleton was excused, and before hearing oral argument, the court indicated that Perry's statement, "[T]his was an accident," appeared to be an admissible spontaneous statement.

The prosecutor argued that Perry's first statement about not wanting to screw himself was made without any questions from Detective Pendleton, and both this statement and Perry's subsequent statement that "this was an accident" were admissible because they were voluntary, spontaneous statements. The prosecutor also argued there was no danger of error under *Doyle [v. Ohio]*, 426 U.S. 610, because Perry volunteered his statements. Defense counsel essentially submitted on his motion papers and Detective Pendleton's testimony.

a. *Court's ruling*

The court denied Perry's motion to exclude evidence of his post-invocation statements, finding there were no "*Miranda* [or] due process violations" and stating it was prepared to allow the prosecution to introduce the statement "this was an accident" in the People's case-in-chief.

//

2. *Opening statements*

During his opening statement, the prosecutor told the jury that when Perry was about to be transported to jail, he told Detective Pendleton that he did not want to screw himself. The prosecutor later added, "[Y]ou will hear about [Perry's] admissions to the detective that this was an accident."

In his opening statement, defense counsel replied:

> "Now you will hear about Mr. Perry's arrest. And they will say, well, he made this statement, 'This is accidental.' Mr. Perry supposedly was in the sally port waiting to be transported to jail and he supposedly made this statement that was not recorded. I'm not even sure it's accurate. And who knows even what it means. [¶] If you think he's talking about the crime charged, assuming he was even advised of the crime charged, assuming he was talking about that, it might indicate he knew something about this, and Mr. Perry–we're not denying he touched the car. We're not denying that maybe he even knew some of the players involved, but what we are denying and what we are saying, they can't prove that he entered the car and shot Mr. Watts."

3. *The court's rulings and Detective Pendleton's testimony during the prosecution's case-in-chief*

During the People's case-in-chief, outside the presence of the jury and over defense counsel's objection under *Doyle v. Ohio, supra*, 426 U.S. 610, the court ruled that Perry's two statements were admissible as spontaneous admissions.

. . . .

Following [a] chambers conference and in front of the jury, the following exchange took place between the prosecutor and Detective Pendleton:

"[The prosecutor]: Detective Pendleton, you testified that the defendant told you that he didn't want to screw himself, right?

"[Detective Pendleton]: Correct.

"[The prosecutor]: And that wasn't in response to any question that you asked him, right?

"[Detective Pendleton]: No.

"[The prosecutor]: Or any statement that you made to him, right?

"[Detective Pendleton]: Right.

"[The prosecutor]: And after hi[s] telling you that he didn't want to screw himself, and I would like you to answer yes or no if you can, after hi[s] telling you that, did he say to you this was accidental?

"[Detective Pendleton]: Yes."

4. *Prosecutor's closing and rebuttal arguments*

During his closing argument, the prosecutor referred three times to Perry's two post-invocation self-incriminating statements. First, he told the jury, "Didn't the defendant tell the police *he didn't want to screw himself* and that *this was an accident* almost a year and a half after this statement would ever have been made when he was arrested?" (Italics added.)

Second, the prosecutor stated that Perry was "taken to the police, [Detective Pendleton] gets his booking . . . information. And when they are to part ways, [Perry], while he was told why he is being arrested, once in Escondido, arrested for the murder of Spencer Watts–and, again, in San Diego, that he was arrested for that College Grove shooting, [Perry] says *he didn't want to screw himself* and *this was accidental.*" (Italics added.)

Last, the prosecutor told the jury, "[I]t's running through [Perry's] mind should I talk to the detective, should I not talk to him, *I don't want to screw myself*. And he tells the detective that and then he tells him *that's accidental* and that's the evidence you have. Another statement made by the defendant. No reason why the detective would make it up. That connects him to the case. Another incriminating statement." (Italics added.)

During his rebuttal argument, the prosecutor again referred to Perry's two post-invocation self-incriminating statements. Specifically, the prosecutor argued that, in order to agree with the defense theory that Perry did not shoot Watts, the jury "would have to conclude that [Perry's] statement[s] to [Detective Pendleton] that *it was an accident* and *he didn't want to screw himself* had nothing to do with the homicide." (Italics added.)

(Lodgment No. 5 at 10-17.)

### III. **Procedural Background**

On March 19, 2009, the District Attorney for the County of San Diego filed an Amended Information charging Petitioner with one count of murder and two counts of robbery. (CT at 5-8.) On February 4, 2010, a jury found Petitioner guilty of first degree felony murder of Spencer Watts with use of a firearm (count 1); attempted robbery of Spencer Watts with use of a

firearm (count 2); and robbery of Keenan Wheeler with use of a firearm (count 3).  (Id. at 103-06.)  Petitioner was sentenced on March 16, 2010 to an indeterminate term of 50 years to life plus 23 years.  (Id. at 221-23.)

Petitioner appealed to the California Court of Appeal, Fourth Appellate District, Division One ("California Court of Appeal").  (Lodgment No. 3.)  On January 31, 2012, in an unpublished opinion, the California Court of Appeal affirmed the judgment.  (Lodgment No. 5.)[3]  Petitioner then filed a Petition for Review in the California Supreme Court, which was denied without comment on April 25, 2012.  (Lodgment Nos. 6, 7.)

On October 15, 2012, Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court.  (Doc. No. 1.)  Respondent filed an Answer on December 17, 2012.  (Doc. No. 7.)  Petitioner did not file a Traverse.

## IV. Discussion

### A. Standard of Review

Habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  Harrington v. Richter, 562 U.S. ----, 131 S.Ct. 770, 786 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)).  A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Federal habeas courts may not "reexamine state-court determinations on state-law questions."

---

[3]The Court of Appeal remanded the matter to the trial court with directions to amend the sentencing minute order to reflect that the 23-year determinate term it imposed as to count 3 was to be served concurrently to the term it imposed as to count 1.  (Lodgment No. 5 at 33.)

Estelle v. McGuire, 502 U.S. 62, 68 (1991); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.")

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs review of Petitioner's claims because he filed his federal habeas petition after that statute's 1996 effective date.  Lindh v. Murphy, 521 U.S. 320, 322-23 (1997).  AEDPA imposes a "'highly deferential standard for evaluating state-court rulings,'" requiring "that state-court decisions be given the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (quoting Lindh, 521 U.S. at 333 n.7).  "AEDPA prevents defendants–and federal courts–from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S.Ct. at 786-87.

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."  Id. at 784.  Federal habeas relief is available under the first exception if the state court result "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Lockyer v. Andrade, 538 U.S. 63, 73-76 (2003); Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (distinguishing the 28 U.S.C. § 2254(d)(1) "contrary to" test from its "unreasonable application" test).  To be found an

"unreasonable application" of the precedent, the state court decision must have been "more than incorrect or erroneous"; it "must have been 'objectively unreasonable.'" Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citations omitted); Renico, 559 U.S. at 779. A lack of holdings from the Supreme Court on the issue presented precludes relief under 28 U.S.C. § 2254(d)(1). Carey v. Musladin, 549 U.S. 70, 77 (2006); see also Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) ("[W]hen a Supreme Court decision does not 'squarely address[] the issue in th[e] case' . . . it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue . . .," and a federal habeas court "must defer to the state court's decision.") (citations omitted). Section "2254(d) mandates that only Supreme Court precedential holdings clearly establish a right, [but] our circuit precedent may provide persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent." Mendez v. Knowles, 556 F.3d 757, 767 (9th Cir. 2009).

Under the second AEDPA exception, habeas relief is available only if the state court based its result "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)"). The question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro

v. Landrigan, 550 U.S. 465, 473 (2007).

Federal courts apply AEDPA standards to the "last reasoned decision" by a state court. Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005); see also Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim [are presumed to] rest upon the same ground."). Federal habeas courts reviewing prisoners' claims under 28 U.S.C. § 2254 "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in" Brecht v. Abrahamson, 507 U.S. 619 (1993). See Fry v. Pliler, 551 U.S. 112, 121 (2007); see also Bains v. Cambra, 204 F.3d 964, 977 (9th Cir. 2000) (stating that the Ninth Circuit applies the Brecht harmless error standard "uniformly in all federal habeas corpus cases under § 2254"). Thus, even if constitutional error occurred, the petitioner must still demonstrate actual prejudice, that is, that the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637-38.

### B.    *Doyle* Error Claim

Petitioner raised his Doyle error claim in his petition for review filed in the California Supreme Court on direct appeal. (Lodgment No. 6.) That court denied the claim without citation of authority. (Lodgment No. 7.) Accordingly, this Court must "look through" the state supreme court's denial to the state appellate court's opinion as the basis for its analysis. Ylst, 501 U.S. at 801-06. In denying Petitioner's Doyle error claim, the California Court of Appeal stated:

> Here, relying on *Bushyhead*[4] and what Perry calls the "explanatory refusal doctrine," under which he asserts "the entire manner of a defendant's invocation is constitutionally

---

[4]United States v. Bushyhead, 270 F.3d 905 (9th Cir. 2001).

protected and cannot be introduced at trial," Perry contends his statements to Detective Pendleton in the sally port–"I don't want to screw myself" and "it was an accident"–were inadmissible "explanatory invocations" protected by the Fifth Amendment.

We conclude *Bushyhead* is not persuasive and decline to follow it. There, the defendant (Bushyhead) claimed on appeal from his first degree murder conviction that the trial court violated the Fifth Amendment and committed reversible *Doyle* error when it (1) permitted an FBI agent to testify that, after Bushyhead was arrested but before he received *Miranda* warnings, he told the agent, "I have nothing to say, *I'm going to get the death penalty anyway*" (*Bushyhead, supra*, 270 F.3d at pp. 907, 908, italics added); and (2) allowed the prosecutor to comment on this statement in both his opening statement and closing argument. (*Id.* at pp. 911-912.) Citing *Wainwright*,[5] *supra*, . . ., for the proposition that "a person's statement invoking his right to silence is part of the 'silence' that must be protected" (*Bushyhead*, at p. 913), and concluding that Bushyhead's statement "was not an unsolicited confession but the invocation of silence itself" (*id.* at p. 912), the Ninth Circuit held in *Bushyhead* that the trial court "impermissibly infringed on Bushyhead's right to silence (*ibid.*) by "admitting the testimony of [the agent] about Bushyhead's statement and . . . allowing the prosecutor to comment on this statement.." [Footnote and citation omitted.]

In support of its holding, the *Bushyhead* court commented that, "[j]ust as a prosecutor at trial cannot use the fact of defendant's post-*Miranda* silence, he also cannot use a statement such as 'I'm not going to say anything' or 'I'm not saying anything until my lawyer gets here.'" (*Bushyhead, supra,* 270 F.3d at p. 913.) We agree with both this portion of the *Bushyhead* court's analysis and its holding that the trial court committed *Doyle* error by admitting evidence of, and allowing the prosecutor to comment upon, Bushyhead's first statement, "I have nothing to say," as this was an unequivocal statement of a desire to remain silent protected by the Fifth Amendment. [Citations omitted.]

However, we do not agree with the *Bushyhead* court's conclusion that the trial court in that case also committed *Doyle* error by admitting evidence of, and allowing the prosecutor to comment upon, what Perry refers to as the "explanatory portion" of Bushyhead's statements: "I'm going to get the death penalty anyway." (See *Bushyhead, supra,* 270 F.3d at p. 913.) In support of this portion of its holding, the Ninth Circuit cited *Wainwright, supra,* 474 U.S. 284, *United States v. Whitehead* (9th Cir. 2000) 200 F.3d 634 (*Whitehead*), and *United States v. Velarde-Gomez* (9th Cir. 2001) 269 F.3d 1023 (*Velarde*) for the proposition that "[t]he privilege against self-incrimination prevents the government's use at trial of evidence of a defendant's silence–not merely the silence itself, but the

---

[5]Wainwright v. Greenfield, 474 U.S. 284 (1986).

> *circumstances of that silence* as well. The *entirety* of Bushyhead's statement was an invocation of his right to silence and is therefore protected by the Fifth Amendment privilege against self-incrimination." (*Bushyhead*, *supra*, 270 F.3d at p. 913, italics added.) In our view, the *Bushyhead* defendant's second "explanatory" statement–"I'm going to get the death penalty anyway"–did not constitute an invocation of his constitutional right to silence as it was neither a "statement of a desire to remain silent [nor a statement] of a desire to remain silent until an attorney has been consulted" (*Wainwright*, *supra*, 474 U.S. at p. 295, fn. 13), even though it immediately followed his first statement–"I have nothing to say"–which was an unequivocal invocation of his right to silence. Thus, this second statement was not protected by the Fifth Amendment privilege against self-incrimination. Accordingly, we disagree with the *Bushyhead* court's conclusion that "[t]he entirety of Bushyhead's statement," including the statement that "I'm going to get the death penalty anyway," was a protected invocation of the right to silence. (See *Bushyhead*, at p. 913.)
>
> For these same reasons, we are also not persuaded by the Ninth Circuit's additional conclusion that the *Bushyhead* defendant's second statement, "I'm going to get the death penalty anyway," was a constitutionally protected "circumstance" of his "silence." (See *Bushyhead*, *supra*, 270 F.2d at p. 913.)

(Lodgment No. 5 at 20-22.) The Court of Appeal then went on to distinguish Wainwright, Whitehead, and Velarde, cited above. (Id. at 22-23.) The state appellate court then continued:

> We also conclude Perry's reliance on *Doyle* is misplaced. Here, the court did not allow the prosecutor to use at trial Perry's invocation of his Fifth Amendment right to silence. As discussed, the court found, and we agree, that Perry's statements were spontaneous statements, the admission into evidence of which did not constitute *Doyle* error. Detective Pendleton's testimony during the Evidence Code section 402 hearing shows that about 30 to 40 minutes after he gave the *Miranda* warnings to Perry and stopped the interview when Perry asked for an attorney, Perry spontaneously stated in the sally port area that he did not want to screw himself. Detective Pendleton stated he had not asked Perry any questions before Perry made this statement. Detective Pendleton testified he then asked Perry whether he now wanted to talk to him and told Perry that if he did want to talk, he (Detective Pendleton) would have to take Perry upstairs again to re-admonish him. Perry replied, "No, this was an accident." Perry's statement, "No," in response to Detective Pendleton['s] question whether he (Perry) wanted to talk to him was an unequivocal invocation of Perry's constitutional right to remain silent. However, his statement that "it [(the shooting)] was an accident," like his statement that he did not want to screw himself, was not an

15

> invocation of Perry's constitutional right to remain silent. The record shows both statements were spontaneous, voluntary, and thus admissible statements. For all of the foregoing reasons, we conclude the court did not commit *Doyle* error.

(Lodgment No. 5 at 23-24.) Finally, the Court of Appeal concluded:

> Even if we were to conclude the court committed constitutional *Doyle* error, and we do not, we would also conclude any such error was harmless beyond a reasonable doubt under the applicable harmless-error standard. [Citations omitted.] The prosecution presented overwhelming evidence . . ., apart from the evidence of his two self-incriminating statements to Detective Pendleton, from which any reasonable jury could find Perry was the shooter who murdered Watts. Wheeler's description of the shooter, the discovery of Perry's fingerprints on the rear driver's side of Watts's car, the evidence of Perry's confession . . . to Winfield at a party that Stanley attended, Perry's stipulated South Oceanside Gangster Crips gang membership at the time of the shooting, and Wheeler's testimony showing the shooter (who sat behind Watts) identified himself as a "Crip," amply support Perry's convictions in this matter.

(Lodgment No. 5 at 24-25.)

Under Doyle, clearly established federal law provides that the use at trial of a defendant's post-arrest silence, after receiving Miranda warnings, violates the Due Process Clause of the Fourteenth Amendment. Doyle, 426 U.S. at 619. Because a defendant in custody must be advised of his right to remain silent under Miranda, the Doyle court concluded that a defendant's silence in the face of these warnings "may be nothing more than the arrestee's exercise of these Miranda rights." Id. at 617. The Supreme Court further clarified in Wainwright v. Greenfield that "[w]ith respect to post-Miranda warnings 'silence,' . . . silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." Wainwright, 474 U.S. at 295 n.13. In United States v. Bushyhead, the Ninth Circuit relied on the aforementioned Wainwright excerpt in stating that "a person's statement invoking his right to silence is part of the 'silence' that must be protected." Bushyhead, 270 F.3d at 913.

In the California Court of Appeal, Petitioner primarily relied upon Bushyhead to argue that his statements were "explanatory invocations," that is, that they were part of the circumstances of his invocation of his right to remain silent, and as such, were protected by the Fifth Amendment. (See Lodgment No. 3 at 19-35 & Lodgment No. 5 at 20.) The California Court of Appeal declined to follow Bushyhead, finding it unpersuasive and finding Petitioner's reliance on Bushyhead misplaced. (Lodgment No. 5 at 20, 23.) The state court's rejection and distinguishing of Bushyhead was not an unreasonable application of Supreme Court authority, as its determination that only the portion of a post-Miranda statement that unequivocally invokes the right to remain silent, i.e., Petitioner's "No" response when Detective Pendleton asked him whether he now wanted to talk and that if he did, he would need to be re-admonished, is protected by the Fifth Amendment was not an unreasonable application of Doyle, which is primarily concerned with protecting a defendant's ability to invoke his Miranda rights without fear that exercising those rights will be used against him. The state appellate court reasonably found that the trial court's exclusion of "No," but admission into evidence of the remainder of the subject statements, adequately protected Petitioner's right to invoke his Fifth Amendment right to silence. Because federal courts can grant habeas relief only when a state court's decision conflicts with clearly established Supreme Court precedent, Doyle cannot provide Petitioner with a basis for federal habeas relief.

The state court's determination that no Doyle error was committed because both of Petitioner's statements were made voluntarily and spontaneously was also not an unreasonable application of clearly established federal law. Detective Pendleton's testimony showed that he gave Petitioner the Miranda warnings and stopped his interview when

Petitioner requested an attorney. It was 30 to 40 minutes after stopping the interview when Petitioner spontaneously stated in the sally port that he did not want to "screw himself." No questioning prompted Petitioner to make the statement. (Lodgment No. 5 at 23.) Detective Pendleton responded to Petitioner's statement by asking Petitioner whether he now wanted to talk to him and if stating that if so, they would need to go upstairs so Petitioner could be re-admonished. Petitioner responded "No," invoking his right to remain silent, and immediately voluntarily and spontaneously continued, "this was an accident." As the record shows both of Petitioner's statements were spontaneous and voluntary, their admission at trial did not violate Doyle. See Miranda, 384 U.S. at 444 (providing that when a suspect fails to remain silent after being given Miranda warnings, whatever he says can be used against him at trial); Doyle, 426 U.S. at 617 (same).

### 2. Even if a Doyle Error Occurred, It Was Harmless

"In federal habeas proceedings, harmless error analysis requires federal courts to determine' whether the error had substantial and injurious effect or influence in determining the jury's verdict.'" Cudjo v. Ayers, 698 F.3d 752, 768 (9th Cir. 2012) (citing Brecht, 407 U.S. at 637). "The overwhelming majority of trial errors . . . do not trigger habeas relief" unless such "substantial or injurious effect or influence" is shown, "or unless the judge 'is in grave doubt' about the harmlessness of the error." Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004) (citing O'Neal v. McAninch, 513 U.S. 432, 436 (1995)).

Here, as the state appellate court found, the admission of Petitioner's two post-invocation statements did not have a substantial or injurious effect on the jury's verdict because of the evidence of Petitioner's guilt apart from the statements in question, including Wheeler's description of the shooter, the discovery of Petitioner's fingerprints on the rear driver's side of Watts's

car, the evidence of Petitioner's confession to Winfield at a party attended by Stanley, Petitioner's stipulated South Oceanside Gangster Crips gang membership at the time of the shooting, and the evidence that the shooter identified himself as a Crip.  (See Lodgment No. 5 at 24-25.)   Given this evidence, no grave doubts exist as to the harmlessness of any error to admit the two statements in question, and habeas relief is not warranted.

For the foregoing reasons, the Court finds that the California Court of Appeal's decision was not contrary to or an unreasonable application of clearly established federal law, nor was its decision based on an unreasonable determination of the facts in light of the evidence presented, and Petitioner's habeas claim should be denied.

## V.    Conclusion and Recommendation

After a thorough review of the record in this matter, the undersigned magistrate judge finds that Petitioner has not shown that he is entitled to federal habeas relief under the applicable legal standards.  Therefore, the undersigned magistrate judge hereby recommends that the Petition be **DENIED WITH PREJUDICE** and that judgment be entered accordingly.

This Report and Recommendation is submitted to the Honorable Larry A. Burns, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  **IT IS ORDERED** that not later than **October 24, 2013**, any party may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."  **IT IS FURTHER ORDERED** that any reply to the objections shall be served and filed not later than **November 7, 2013**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th

Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: October 3, 2013

Jan M. Adler
U.S. Magistrate Judge